**In the United States District Court  
for the District of Kansas**

---

Case No. 5:21-cr-40039-TC

---

UNITED STATES OF AMERICA

v.

DARREN JAMES JACKSON

---

**MEMORANDUM AND ORDER**

Darren Jackson was arrested without a warrant for an alleged aggravated robbery that had taken place several weeks prior. During the arrest, law enforcement recovered a handgun, and Jackson was later indicted for unlawfully possessing a firearm under 18 U.S.C. § 922(g). Doc. 1. He moves to suppress the firearm as the product of an unlawful, warrantless arrest. Doc. 17. For the following reasons, Jackson's motion is denied.

**I**

**A**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. An arrest is "the quintessential" seizure of a person, *California v. Hodari D.*, 499 U.S. 621, 624 (1991), and therefore "must be reasonable under the circumstances," *District of Columbia v. Wesby*, 138 S. Ct. 577, 585–86 (2018). Warrantless arrests are reasonable when an officer has probable cause to believe that the person committed a criminal offense. *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007).

If a search or seizure violates the Constitution, the exclusionary rule generally forbids the use of improperly obtained evidence at trial. *Herring v. United States*, 555 U.S. 135, 139 (2009). The rule applies only where it "result[s] in appreciable deterrence" for law enforcement. *Id.*

1

at 141 (alteration in original) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). Thus, suppression is not "an automatic consequence of a Fourth Amendment violation." *Id.* at 137.

**B**

**1.** On April 7, 2020, Saline County law enforcement officers arrested Jackson—without a warrant—for an aggravated robbery committed six weeks prior. They converged on Jackson with guns drawn as he was leaving a grocery store in Salina, Kansas. Jackson submitted immediately. As he did, he took out a firearm from his waistband and laid on it on the ground. Officers recovered the firearm shortly after Jackson was taken into custody. The federal government later charged him with being a felon in possession of a firearm under 18 U.S.C. § 922(g). Doc. 1.

The alleged aggravated robbery occurred that February in Saline County. Three officers responded to a report that two travelers needed assistance. The travelers, Stephanie Gunts and Kevin Fernandez, said that they had been the victims of an armed robbery. The two were heading home from Denver to Florida when they were kicked off of a Greyhound bus near Topeka. Stranded, they called Kinnsley "Charlie" Mathews, whom they had met in Denver and knew to be in the area, for a ride.

The travelers said that Mathews picked them up and drove them back toward Salina, taking a detour along the way to visit her son's grave. Neither traveler expressly described a fourth person in the vehicle, though Gunts's account implies that there was someone else. *See* Def. Ex. 206 at 2. At some point, Mathews stopped the car, and another car pulled up behind them. According to the travelers, two males and one female got out of the other car and robbed them at gunpoint. Def. Ex. 205 at 3. Gunts described the gun as black and silver. *Id.* The travelers then gave the officers the phone number they used to reach Mathews.

In their reports of this initial encounter, two responding officers noted that the travelers provided conflicting, confusing, and incomplete statements regarding the robbery and were not able to describe in detail any of the vehicles or individuals involved. Def. Exs. 205 at 3–4 & 206 at 2. Both officers noted possible drug impairment and how the travelers eventually were hesitant to provide further information. Both became markedly uncooperative when asked about a search of

their luggage. Gunts even went so far as to say she no longer wanted to report the robbery. Def. Ex. 205 at 4.

The next day, two different investigators followed up with Gunts and Fernandez at their motel. But this time, only Fernandez spoke with the investigators.[1] Some details of his story differed from the day before. He said that Mathews picked them up in a light-colored, four-door car that was possibly gray, but that she was not alone. Mathews sat in the front passenger seat while a white male with short brown hair and a dark goatee drove. Doc. 18 at 8. He described the robbers as two white males and a white female with dark hair. The gun was silver. He added that he thought Mathews and the driver had set them up. *Id.* at 8–9.

Three weeks after the alleged robbery, on March 16, Saline County investigator Walsh interviewed Mathews at the Sheriff's office. Doc. 17 at 7. Mathews asked if she was under arrest; she was not. *Id.* She was read her Miranda rights and waived them. *Id.* Walsh asked Mathews if she knew a Stephanie Gunts or Kevin Fernandez, to which she shook her head no. Doc. 19 at 4. Then Walsh said, "The decision you need to make is do I want to be part of this or do I want to be a witness?" *Id.* at 4–5. Mathews said she wanted to be a witness.

Mathews explained that she and Jackson together picked up the travelers and that she had called Jackson to help because he had a vehicle and was not working. They used a blue car, and she drove while Jackson rode in the passenger seat. Doc. 18 at 10; Doc. 19 at 5. At some point after picking up Gunts and Fernandez, Jackson demanded that Mathews pull over. Two others—whom she identified by name (Jesse Rick and Heather Stebbins (Davis))—then pulled up behind in another car, ordered the travelers out, and robbed them at gunpoint. Doc. 17 at 7; Doc. 18 at 10–11. Mathews claimed that Jackson participated in the robbery before coming back to their vehicle and that she and Jackson then drove off, leaving the travelers. Mathews said that she felt like she did not have a choice in the robbery and had to leave the victims behind. In addition, Mathews indicated that she had been in a relationship with Jackson for a few months and that they often fought. Doc. 18 at 11. Walsh was aware of documented incidents of

---

[1] Officer Kody Trower was one of them, as he testified to at the hearing. Doc. 32.

3

domestic violence by Jackson against Mathews. Doc. 18 at 11. The record shows no subsequent investigative efforts regarding Mathews.[2]

Meanwhile, police surveilled Jackson. Doc. 17 at 8. They saw him regularly associating with Rick and Davis. *See* Doc. 17 at 8; Def. Ex. 201. Still, officers did not observe Jackson engaged in criminal activity, and there were no additional reports made about the earlier robbery. During this time, Jackson was not seen driving a blue car (though one of Jackson's associates was seen with a gray car).

Finally, on the morning of the arrest, officers applied for a *search* warrant for Jackson's residence.[3] Trower (the investigator who spoke with Fernandez at the motel) prepared the affidavit for the search warrant. *See* Def. Ex. 201. Officers sought to find in Jackson's home evidence of "aggravated robbery, criminal restraint, and possession of a firearm by a convicted felon." *Id.* The affidavit recounted the travelers' reports, Mathews's interview, and Jackson's later association with Rick and Davis. *See id.* A state court judge issued the search warrant and officers executed it that same day, but before Jackson's arrest. Nothing of evidentiary value was seized in Jackson's home. Still, following his arrest, the State of Kansas charged Jackson with the aggravated

---

[2] Defendant's briefing references a handwritten note (purportedly from Mathews and dated five days after her interview) in which she retracts her story and expressly refers to herself and Jackson as *victims* along with the two travelers. Doc. 19 at 9–10. If the note had been known to officers before the arrest, it would factor significantly into the probable cause inquiry as important exculpatory evidence that would undermine reliance on Mathews's assertion that Jackson committed the robbery. The hearing did not resolve whether that was the case. But after the hearing, the parties submitted a filing explaining that the "officers had no knowledge of the contents of the note and no possession of the note prior to the arrest . . . on April 7, 2020," and only became aware of it several weeks later. Doc. 33 at 2.

[3] No attempt was made to obtain an arrest warrant. At the hearing, Officer Jeremiah Hayes testified that it was typical practice to not seek arrest warrants and to instead proceed on probable cause alone for felony arrests. He noted a concern that Defendant might learn of the warrant and flee before it could be executed. On cross examination, he acknowledged that the same rationale would apply to search warrants and offered no ready explanation for the incongruity. These comments are troubling. *Cf. Missouri v. McNeely*, 569 U.S. 141, 155 (2013) (recognizing the neutral magistrate serves an "essential role as a check on police discretion").

robbery. A preliminary hearing was held in November 2020. According to the Government, Mathews testified at that hearing, though her testimony "was not as complete or comprehensive" as her prior interview.[4] Doc. 18 at 19. And, the Government continues, the judge did not hear from the travelers[5] and did not have all of the evidence on which the earlier investigators relied. *Id.* Jackson has not challenged the Government's representation of these facts. Ultimately, the state court judge found that there was not probable cause to bind over Jackson on the aggravated robbery charges.[6]

**2.** Jackson moves to suppress the firearm evidence that was obtained from his arrest. He argues that the warrantless arrest was unlawful because it was not supported by probable cause. He points to the travelers' inconsistent and contradictory statements, the lack of corroborating evidence from officers' surveillance efforts, and Mathews's questionable credibility.

The Government argues that law enforcement had probable cause based on Mathews's and the travelers' largely consistent versions of events, noting that they "independently corroborated much of each other's information." Doc. 18 at 15. Finally, if a Fourth Amendment violation is found, the Government argues that the Court should not apply the exclusionary rule because the arresting officers' conduct was reasonable and not "deliberate, reckless, or grossly negligent." *Id.* at 23.

## II

Defendant's motion to suppress the firearm and related evidence obtained from his arrest is denied. The warrantless arrest was lawful

---

[4] It is unclear from the record whether the state court judge considered Mathews's handwritten note.

[5] Later attempts to contact the travelers after their February 2020 interviews were unsuccessful, and they have not been involved in this investigation or case since.

[6] In Kansas, probable cause is required to bind over a defendant for trial. *State v. Wilson*, 986 P.2d 365, 368 (Kan. 1999). This similar inquiry asks whether there is probable cause to believe that a crime was committed and whether the defendant committed it. *Id.* Importantly, at this stage, "a judge is required to pass judgment on the credibility of witnesses called by the prosecution and defense." *Id.* at 369.

because, based on the information known to the officers at the time of the arrest, it was supported by probable cause that Jackson had committed a crime.

### A

There is no dispute that Jackson was arrested without a warrant. For his arrest to be lawful, it must have been supported by probable cause that he committed a crime. *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007).

Probable cause for an arrest is evaluated by examining the facts leading up to arrest as if "viewed from the standpoint of an objectively reasonable police officer." *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1220 (10th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)). The inquiry looks to the totality of the circumstances. *Wesby*, 138 S. Ct. at 586. Actual proof of criminal activity is not required, but there must be a "substantial probability" of it, as opposed to "a bare suspicion." *Hinkle*, 962 F.3d at 1220 (quoting *Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017)). This is "not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). Instead, officers need "only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Hinkle*, 962 F.3d at 1220 (quoting *Kaley*, 571 U.S. at 338). Necessarily, probable cause must be based on "reasonably trustworthy information." *Wilkins v. DeReyes*, 528 F.3d 790, 805 (10th Cir. 2008) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

A single victim or known eyewitness is generally sufficient for probable cause, provided that witness is credible and the information is not the product of coercion or manipulation. *See Hartz v. Campbell*, 680 Fed. App'x 703, 706 (10th Cir. 2017);[7] *Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015). Where multiple witnesses are involved, minor

---

[7] *Hartz* favorably cited three cases from other circuits. They support the proposition that a single eyewitness is sufficient for probable cause absent an "apparent grudge" against the accused, *Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012); absent a showing of doubt as to the witness's veracity, *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001); or absent a reason for the officer to believe that the eyewitness was lying or mistaken. *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999). *See also Donahue v. Wihongi*, 948 F.3d 1177, 1189 (10th Cir. 2020) (discussing greater presumption of credibility for known eyewitnesses than anonymous tipsters).

inconsistencies among witnesses' statements do not necessarily mean that those witnesses are either mistaken or not credible. *Hart*, 798 F.3d at 591. Officers need not engage in "fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands." *Hinkle*, 962 F.3d at 1220 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975)).

**B**

Applying this standard, the evidence confirms that the arrest was lawful. At the time that they arrested Jackson, officers had probable cause to believe that he had committed or took part in the alleged aggravated robbery.

First, there is no genuine dispute that the officers had probable cause on April 7, 2020, to believe that a crime had taken place. Police responded to a robbery report and took statements from the alleged victims who said they had been robbed at gunpoint and who also provided other general details about the crime's location and manner. The victims identified a third witness—Mathews—whom officers later contacted and interviewed. Her story largely corroborated the travelers' report, even if there were minor inconsistencies like the precise vehicle's color and who was driving. *See United States v. Traxler*, 477 F.3d 1243, 1247 (10th Cir. 2007); *see also Seiser v. City of Chicago*, 762 F.3d 647, 655 (7th Cir. 2014). In essence, three eyewitnesses agreed that a robbery occurred. And absent indication that all three were lying or untrustworthy, a reasonable officer would have been justified in concluding the same.

Second, an eyewitness's statements directly implicated Jackson in the robbery. Mathews named Jackson, and her account was generally consistent with the earlier statements from the travelers. An officer interviewed her in person and could evaluate her demeanor, question her about the incident, and assess her veracity. *See J.B. v. Washington Cnty.*, 127 F.3d 919, 930 (10th Cir. 1997). Officers did not rely simply on rumor or hearsay. *See Cortez*, 478 F.3d at 1116–17. Nor is there evidence that officers ignored "readily available exculpatory evidence that they unreasonably fail[ed] to ascertain." *Hinkle*, 962 F.3d at 1221 (quoting *Maresca v. Bernalillo Cnty.*, 804 F.3d 1301, 1310 (10th Cir. 2015)); *see Romero v. Fay*, 45 F.3d 1472, 1476–77 n.2 (10th Cir. 1995) (providing examples). On the record here, it appears that there was no exculpatory evidence to ignore. Officers interviewed the only witnesses they were able to identify, and their statements were consistent in relevant,

7

material respects: a crime had occurred and Jackson was involved.[8] Thus, the arrest was supported by probable cause and lawful.

Jackson argues that officers should have discounted Mathews credibility for a few reasons. He points to their past relationship and reports of domestic violence. But absent something more, this simply amounts to credibility-weighing, which officers may do with the information available to them. While Jackson or others might have reasonably arrived at a different conclusion, that is no matter. *Hinkle*, 962 F.3d at 1220 ("[C]redibility determinations are seldom crucial in deciding whether the evidence supports a reasonable belief in guilt."). Even so, the record's evidence of Mathews's history with Jackson is insufficient to establish her unreliability as a witness. *Cf. United States v. Patane*, 304 F.3d 1013, 1016–17 (10th Cir. 2002), *rev'd on other grounds*, 542 U.S. 630 (2004) ("We reject any suggestion that victims of domestic violence are unreliable witnesses whose testimony cannot establish probable cause absent independent corroboration.").

Jackson also seems to imply that there was a coerciveness to Mathews's interview and that "she was simply taking the lead" from the investigator because he gave her the option of being either a witness or a codefendant. *See* Doc. 19 at 4–7. Yet Jackson has not directly argued that Mathews's interview was coerced or involuntary, and his implications are not sufficient to call into question Mathews's statements. As the hearing testimony established, although the interview took place at the Sheriff's office,[9] Mathews was not in custody and volunteered the information after receiving a *Miranda* warning. *Cf. United States v. Gonzales*, 164 F.3d 1285, 1289–91 (10th Cir. 1999)

---

[8] The later-received note, in which Mathews changes her story, does not affect the analysis. An arrest's validity depends on what officers knew at the moment of arrest, not on information learned after the fact. *Hinkle*, 962 F.3d at 1221.

[9] Mathews was already in the Sheriff's office on the morning of March 16 for another matter involving some of the individuals she named (*e.g.*, Davis). Doc. 19 at 6. She gave an interview regarding that matter, which was recorded, prior to the interview discussed in this motion. Jackson sought discovery of the recording of that earlier interview. Doc. 22. The Government opposed and moved for a protective order. Doc. 26. After reviewing the recording *in camera* and *ex parte*, the Court determined that its contents are immaterial to the probable cause inquiry and denied Jackson's request. *See* Docs. 30 & 31.

(finding uncoerced a witness's statements to officers when presented with an arrest warrant for charges related to her involvement in defendants' scheme, after having been advised of her rights).

Jackson also argues that "no real police work was done to corroborate" Mathews's statements. Doc. 19 at 5. He mentions that officers did not ask for her phone to confirm that there was communication between her and Jackson, did not seek location data to confirm where she was during the alleged events, and did not ask her to identify anyone from a photo lineup. *Id.* But these challenges overstate the probable cause burden for officers investigating a crime. Mathews's identification and description of events, absent some evidence that a reasonable officer should not have believed her, are sufficient. There is no record that police "ignore[d] available and undisputed facts." *Baptiste v. J.C. Penney, Co.*, 147 F.3d 1252, 1259 (10th Cir. 1998). Again, probable cause does not require "an actual showing" of criminal activity, only a probability. *Wesby*, 138 S. Ct. at 586. Officers do not need to go down all possible investigative paths or resolve all inconsistencies in witness accounts. *See Cortez*, 478 F.3d at 1121 n.18; *see also Patane*, 304 F.3d at 1018 ("The mere fact that further corroboration was possible is not dispositive of whether the information available would lead a reasonable person to believe that an offense had been committed."). All told, officers had statements from two victims and an additional witness, with no evidence that any of them were lying and no reason to doubt each's veracity.

In a footnote, Jackson argues that the state court judge's finding of no probable cause to bind him over bolsters his conclusion that officers lacked probable cause to arrest. Doc. 17 at 15 n.3. But the state judge did not rely solely on the evidence that was known to officers at the time of arrest, which is the critical moment. *Hinkle*, 962 F.3d at 1221. Later conclusions based on later-learned evidence—even conclusions of innocence—are not relevant to an arrest's lawfulness. *See Baker v. McCollan*, 443 U.S. 137, 145 (1975) ("The Constitution does not guarantee that only the guilty will be arrested."). The state court preliminary hearing took place more than seven months after the arrest. The victim travelers were not present to testify, the judge did not have the full evidence available to officers leading up to the arrest, and Mathews's testimony was not the same as her earlier interview. Doc. 18 at 19–20. Therefore, that judge's determination has no bearing on this motion.

9

Finally, Jackson argues that the lack of additional corroborating evidence from surveillance and the search warrant's execution, along with inconsistencies like the car color, dissipated whatever probable cause there might have been following Mathews's interview. Doc. 19 at 8–9. It is true that probable cause is not unassailable once formed: An officer may develop probable cause one day, only for it to "dissipate" days or weeks later with new "information learned." *Hinkle*, 962 F.3d at 1221 (noting that officers are accountable for "readily available exculpatory evidence that they unreasonably fail to ascertain."). Time delay by itself, without new information, is not enough to dissipate probable cause.[10] Yet Jackson has not pointed to new information learned. Instead, he argues for dissipation based on a *lack* of new corroborating evidence. But a failure to find additional corroborating evidence does not dissipate probable cause that is already sufficiently established. *Patane*, 304 F.3d at 1018. Jackson has not identified contradictory or exculpatory information. *See, e.g.*, *United States v. Dalton*, 918 F.3d 1117, 1127–29 (10th Cir. 2019). And in fact, police surveillance provided some positive confirmation of Mathews's story: Jackson was observed regularly associating with the two other alleged perpetrators that she had named, Rick and Davis.

On the whole, therefore, Jackson's arguments fail against the Government's sufficient showing that the officers had probable cause for

---

[10] Jackson acknowledges there is no "per se rule" under which some sufficient time delay dissipates probable cause. *See* Doc. 19 at 7. Contrast this with the search warrant context, where delay in executing the warrant may mean that probable cause dissipates by the time of execution. Unlike with arrests based on probable cause that one has committed a crime, there is a temporal element to search warrants. *See United States v. Grubbs*, 547 U.S. 90, 95 n.2, 96 (2006). Inherent in a search warrant based on probable cause that evidence will be found in a certain location is a belief that the evidence will be found *when the search is conducted*. The reliability of that premise could change over time as new facts are learned or the basis of original probable cause becomes "stale." *United States v. Dalton*, 918 F.3d 1117, 1127–28 (10th Cir. 2019). But for an arrest, when it takes place should not affect an officer's belief that the person committed a crime at some time in the past. *See United States v. Edwards*, 632 F.3d 633, 640 (10th Cir. 2001) (citing *United States v. Watson*, 423 U.S. 411, 449 (1976) (Marshall, J., dissenting) ("[P]robable cause to arrest, once formed, will continue to exist for the indefinite future, at least if no intervening exculpatory facts come to light.")).

Jackson's arrest. Under the totality of the circumstances, officers were reasonable in relying on the information available to them.

### III

For the reasons set forth above, Defendant's motion to suppress evidence, Doc. 17, is DENIED.

It is so ordered.


Date:  June 13, 2022                     s/ Toby Crouse
                                         Toby Crouse
                                         United States District Judge